Okay, Kardash, Commissioner, Mr. Brooks, Good morning, Your Honors. Good morning. Please the Court, my name is Eric Brooks. I'm here on behalf of the Appellant, William Kardash. Today, I want to focus on the practical common sense issues that are at play with the primary issues in this case. First, the issue of value versus reasonably equivalent value. Now, we know the lower court failed to apply the proper legal test to the issue of value. The test it applied was the totality of the circumstances, whereas the proper test is actually broader than that. The proper test is whether the transferor received any palpable benefit or any realizable commercial value in the exchange, and this is particularly true in the case of an exchange for intangibles, such as services. The totality of the circumstances factors that the lower court cited play no role in the value analysis. Now, the facts and circumstances make clear that Mr. Kardash's employer received some benefit for the 2005-2007 transfers, and that's because the services that Mr. Kardash provided in 2005-2007 are the exact same services that he provided in 2003 and 2004. You're talking about the dividends. I mean, you don't want to call them dividends, but your client reported them as dividends and as tax returns. That is correct. The 2005-2007 transfers were reported as dividends. All right. And they were significantly in excess of the bonus payments that had been made in earlier years. Isn't that right? I agree. They are significantly greater. Is there any evidence that he was performing more services in those years? I don't know that there is, Your Honor, but there's no evidence that he was performing less. There's no evidence that the quantity, quality, or nature of the services he provided were any different than what he provided in 2003 and 2004. In regard to years 2003-2004 But he gets paid three times as much, or whatever the amount was. And Your Honor, I would simply say that that goes to the question of reasonably equivalent value, not the issue of value. Counsel, can you help me here, because maybe I missed some numbers, but it looked to me as though the record said in 2003, including the advance payments, he got $339,000. In 2004, he got $635,000, which is a good bit more. But in 2005-2007, he was paid in the $300,000 to $400,000 range. So it wasn't like the dividends were the only payments he got. He was getting a substantial amount as regular pay. Now, I did not see how much he got in the bonuses. People said he got substantial bonuses before 2003. Did I miss something? Does the record tell us how much those earlier bonuses were? Your Honor, I do not know what the bonuses were prior to 2003. In the trial court's order, it says that he routinely received in excess of hundreds of thousands of dollars per year. Okay. But the reason I'm pressing this point is that in 2005, 2006, and 2007, he was paid in regular pay hundreds of thousands. He got $411,000 one year, $388,000 another, so that it's not as though they suddenly quit paying him and gave it all as dividends. Isn't that right? That is right. But what he received in salary in 2005 and 2006 is far less than what he received in the combination of salary and bonus in 2003 and 2004. Now, correct me if I'm wrong. In 2004, you're correct. In 2003, I thought the statement was $339,000, which would back out $250,000 in the advance payment and $89,000 in pay. That's the only figure I saw. Your Honor, I do have those figures in a copy. Okay. You might get it on rebuttal then because my chart was the way I stated. Go ahead. In regard to the 2003 and 2004 transfers, the tax court found that his employer, which I'll call Cascrete today rather than Florida Engineered Concrete Products, the company was experiencing unprecedented growth. Mr. Kardash was instrumental to the company's success. Mr. Kardash would have been suspicious if he was not compensated fairly. Prior to 2003, Cascrete had a bonus program. Mr. Kardash received significant compensation under that program. The bonuses depended on his performance, and the 2003-2004 transfers were paid out of the company's pre-tax profits. Now, the tax court held that those transfers in 2003 and 2004 were not only exchanged for value, but were exchanged for reasonably equivalent value. Well, every one of those factors, with the exception of unprecedented growth in regard to 2007, every one of those factors also applies to the 2005-2007 dividend transfers. And the company's two best years of revenue were in 2005 and 2006. So the only difference between those transfers was that the company, the company's principals, who were fleecing Cascrete, elected to pay them as dividends, and that those payments corresponded to Mr. Kardash's percentage stock ownership. Did they? Because I, that's my question. When he got this million, million and a half, I thought the other guys were getting like 16 million and 21 million, which would be, he has one-fifth as much stock as each of them, I understood, and these guys were getting about 10 times as much. Am I wrong about that, or were they getting the same per share dividend that he was? I believe it was the same per share dividend. I can check those numbers. Math doesn't seem to add up, but okay, go ahead. If you say so, that's fine, because that's actually contrary to your, to your... Well, exactly. I mean, I would love to say it didn't, but I believe it did line up. That's fair. So, the point on this matter is that these dividend transfers, which Mr. Kardash had no control over, he's the VP of Engineering. He's the technical guy. He's gotten paid far in addition to his salary every year, at least from 03 on, we know the exact numbers. He doesn't care how it's paid. He just wants his money. These transfers, just like the 03-04 bonus advances, are simply substitutions for the bonus program. So if we ignore for a moment whether these particular transfers were exchanged for reasonably equivalent value, or whether dividends can ever be exchanged for reasonably equivalent value, we just have to see. He played the same role, and I don't know how we conclude that there was no value whatsoever exchanged for those transfers. I don't know how we get to that with the evidence we have. Are you saying that the law is that if you get a peppercorn of value, the transfer can't be fraudulent? No, Your Honor. The reason why I'm saying this... You kept saying any value, any value. That's why I'm... Well, and I am implying that this is not just a negligible value. There is some significant value based on the payments in 03 and 04. But the reason why this prejudices Mr. Kardash is because of the offset, or the benefit, that he's owed as a good-faith transferee under Florida's Uniform Fraudulent Transfer Act. Mr. Brooks, I know you're not talking about this exhaustion idea, but I thought that's what we were going to be talking about this morning, the idea that before you can collect taxes from the transferee, you have to exhaust the collection efforts against the person who transferred the money. My law clerk found a United States Supreme Court case, Healy v. Commissioner of the Internal Revenue Service, that says transferee liability is secondary to primary liability of the transferor. To sustain transferee liability, the commissioner must prove that he is unable to collect the Your Honor, I'm not familiar with that case. What year was that? It's old. It's older than I am. It's 1953. But, I mean, as far as I can tell, it's still good law. I just didn't know if you knew about that. No, Your Honor. Honestly, we focused on the cases that were post-stern from 1958. I did find a case that had a similar holding, which was Coffee Pot Holdings, I believe, from 1940, that said that the commissioner had no obligation to first pursue collection efforts against the transferee. But that case was cited repeatedly in later years by courts that followed the gum factors and stated that reasonable, non-futile collection efforts were required. Counsel, let me ask you about this, because I guess maybe I have a certain sympathy in going after the transferor first, if there's any likelihood that you're going to be able to be made whole. Now, in this case, let's suppose we were to rule in your favor in some way. It goes back. They can make all the efforts in the world against FEPC, and they're never going to get anywhere near the $120 million. Would you have a procedural bar then? Would they be out of luck because of statute of limitations or something, or would it just be a futile round trip in which they could go back, they could close FEPC, seize every shirt button, and they're not going to get the $125 million, and then we'd be right back here. Had you thought that through, or do you have a procedural defense that if we reverse now, they'd be out of luck and they couldn't come after you? Your Honor, standing before you today, I cannot say. Okay, maybe your adversary may have an answer there. That's fine. But just as a larger issue, this idea that if the Kardash opinion is affirmed on that point about reasonable collection efforts, what that means is that the commissioner no longer has any obligation in any circumstance to first pursue collection efforts against the transferor. I mean, we don't have to write an opinion that says that. I mean, I kind of agree with Judge Boggs. I mean, the statute that you're relying on that says they have to exhaust says that the IRS has to make, quote, all reasonable collection efforts or something like that against the transferor, and where the tax liability is hundreds, let's just say $100 million, that they can pay $70,000 a year or, by liquidation, $3 million total. I mean, it's never, they're never going to be able to collect. So why isn't that a reasonable effort? Why didn't that comply with the statute? Well, Your Honor, we're arguing that the statute, or I guess really the commissioner's argument, doesn't require that. There's case law that says reasonable collection efforts, right? That is correct. No one's arguing that the statute says that, are they? That is accurate, and that's the issue here, is that no uniform fraudulent transfer act or fraudulent conveyance act requires reasonable collection efforts. It's not an element. So following the commissioner's argument, it's simply never required in any jurisdiction with those uniform acts. I see my time has run out. Okay. I'm just trying to clarify what our arguments are. Now, there is a statute, but it didn't appear to say that. Do we have any more questions? All right. Let's hear from Mr. I better put on my glasses, Mr. Hutter. I almost said Hunter, see? Many people do. Thank you very much. May it please the court, Randolph Hutter for the commissioner. I definitely wanted to talk about both the dividend issue and the exhaustion of collection. Why don't I briefly touch on the dividend issue? I think you might have more questions about the exhaustion of collection, but you're in charge of that. First of all, I wanted to say with regard to the dividends that the objective uncontroverted evidence in the record supports the tax court's ruling that they were dividends and that the no value was given in return for them. FECP reported these payments to the IRS as dividends, not as compensation, all of them. Mr. Kardash reported these payments, all of them, as dividends to the IRS and paid less tax on them as a result. At the trial, Mr. Kardash testified that he correctly characterized the payments as dividends on his tax return. So there's really very little way to get around their characterization of dividends. What the taxpayer is arguing, what the transferee, Mr. Kardash, is arguing is that yes, they're dividends, but they're also compensation. Well, of course, from a tax reporting point of view, that's impossible because they can't be taxed as both. They have to be taxed as one or the other. On his side, is the tax treatment really important? You may be able to get him for the equivalent value. Correct. This is not his tax case, therefore. But still, it also flies in the face of the traditional definition of dividend. Dividend is return on shareholder earnings, stock holdings, shall I say. And Mr. Kardash did own stock, and there are notations on several of the checks that were paid to him that say dividend. And the real issue is, as I understand it, is the tax court made a finding of fact about this, right? Yes. He received, the company received no value. Yes. And so the evidence you're recounting really is, your argument is that that supports that finding that we can't say is clear. Of course. And they point to no evidence in the record that shows that these payments were compensation. There's discussion about the evolution of... Even if they did have evidence, it wouldn't matter. If there's evidence on both sides, the tax court could choose. Absolutely correct. I think the tax court's findings on this are not clearly erroneous. But also, they had Mr. Stanton on the stand in the trial, and they had a chance to ask him, were these compensation? And they didn't ask. Mr. Stanton didn't testify that these were paid to him as compensation. The issue of these dividends, the characterization was avoided completely at trial. That speaks volumes, I think, that he could not, perhaps they knew that he could not justify... And Mr. Stanton's one of the people that siphoned tens of millions. He wrote the checks. Absolutely. He wrote much bigger ones to himself. He wrote these checks. Do you agree that the dividend payments were at the same rate for all of the folks? I do believe that is correct. But at the same time, it's clear that Mr. Stanton and Mr. Hughes were just committing fraud. So they could have siphoned off a lot more that was not dividends, and still characterize these as dividends, and it's only the characterization with regard to Mr. Kardash that matters. So even if those weren't somehow per share for Mr. Stanton and Mr. Hughes, they still could be dividends for Mr. Kardash, because the intent, as the tax court found, the intent with which those other payments were going out of the company doesn't... Did you have any better answer than your colleague or what I found in the record about how big the bonuses were in the pre-'03 period? I could not find any evidence in the record about exactly how much those were. But of course, the point that you brought out that these, several of you, both of you, point out that these dividends were greatly in excess of what Mr. Kardash had gotten in the past. With regard to my hypothetical about if we were to remand and send it back, would you have any procedural barrier to just saying, okay, we'll seize everything, we'll throw all the people out of work, and then we'll come after you for the remaining $100 million? Well now you're crossing back into the reasonable collection efforts. I'm sorry, you're right. If I'm messing up... That's okay. Well, let me just... I'll get right to it. Let me just finish that I don't think there's any objective evidence supporting Mr. Kardash's position with regard to the dividends, and I think the tax court's position on that is clearly correct. And with regard to the exhaustion of the collection efforts, number one, the first thing I want to say is that the tax court had to look at it as things stood then and make a determination. It's not in the law that it was required to make a determination whether the collection efforts against FECP had been reasonable, but it basically did examine those methods. Well, why is it that there's so much case law that appears to say that they have to do that, and then there appears to be some that there's not, that doesn't say that? What are we to make of that? I think you were to make of the fact that this law has been developing for several years, for decades, and part of it has to do with the fact that there used to be two different procedures, that the government had to proceed, creditors had to proceed in state court under law to get an amount determined, and then separately under equity to get the liability absolutely established. And in case law, in bits and pieces, it has come across in the tax court, they looked at some legislative history that said, well, the legislative history, there's a Senate finance report that says, you know, in some cases, the government can't get everything from the debtor, therefore, we're going to enact this statute in order to allow it to get money from the transferee, and we're going to set up a federal procedure that legislative history, for instance, is mentioned in the wire wheel case, a BTA case from I think the 30s or 20s, I forget exactly. So the federal government set up a procedure, a new procedure with federal procedure under 6901 is what it's called now. So this is 6901A1A? Yes. And I can't, one of the problems is the tax court has, of course, several different judges, they don't sit on bunk, they don't sit alone, I mean together all the time, and the different judges came to different conclusions regarding what had to be done. Do you have a hint from your adversary that at least a lot of the cases on your side are coming from Judge Gecki? Well, two or three did, but definitely three or four others did not. Half is still a lot from one judge. I remember one from Judge Swift, I can't remember the names, but definitely there have been other judges doing this. And of course, to try to finish my answer on your procedural, if the court goes back now, it should look at how things stood then. It should look at whether things had been reasonably undertaken, collection efforts against the debtor at that time against FECP and not the way they are now. I'm confused about this argument because it appears to me that you're arguing that we do, in fact, need to make a determination from the record about whether the service made an evaluation of reasonable collection efforts. And I thought your argument had been that there is no such obligation. That is our argument. Absolutely. If I've confused you, I certainly apologize. That is our argument because that's what the tax court said. The tax court said, Mr. Kardash, I don't have to reach that issue because that's not in the statute. And Commissioner v. Stern, the Supreme Court case from 1958, says we look to state law for substantive liability. Therefore, that's not part of the rule anymore. It used to be, perhaps, but it's not part of the rule anymore. So that is our argument. The only way... You're referring to it as a federal procedure, though, and where you're implementing federal procedure, you don't look to state law. And it seems like the procedure for collecting these back taxes would be governed by federal law and not state law. Isn't that right? And the government does look to the taxpayer to collect the debt first, as we did here. And the evidence shows that we did here. Well, but what the tax court did was said, we look to Florida law. Florida law doesn't require us to exhaust against the debtor. Correct. Correct. Well, the only other source of that kind of law would be federal common law. And that is exactly what was rejected in the Stern case by the Supreme Court in 1958. Do you know this Healy case? Have you ever heard of that or read about it? I apologize. I had not come across the Healy case. It predates the Stern case. I'll have to look at it. And I did not know... When was 6901A enacted? I think it's the code of 1954. You said that there was a predecessor, 280? Yes, 280, I think in the middle. That is the way, in the brief, I got the impression that it was just a renumbering in 54. Am I wrong? I believe that's right. But at the same time, I would certainly like to point out that Congress has to be presumed to know about this law that's been developing in the tax court before it enacted the statute in 1954. And yet it is not included in 6901. They specifically wrote the statute and they did not include that provision. So they seem to be happy with... Let me take you back there because I thought, my going in impression was that 6901 is just the same as 280. So it's just a mindless reenactment. Is it different? I'm sorry. I do not know the difference in the text. I cannot say that. Look, but that was the impression I got from the citation. I cannot say that. But at the same time, reenacted in 1954, this body of law was out there at that time and they did not put... This body of law. Any decisions regarding what the government had to do with regard to collection activity against the... Were they going both ways? I mean, as Judge Pryor correctly said, we've got six tax cases on each side. Before 1954, weren't there already on both sides? I think, actually, well, I don't... If I want to make much of this point, that's where I would look first, right, even assuming that Congress had any idea. Yes. Okay, we can look at it. But there definitely were cases before this, before 1954, that indicated that the government should look to the taxpayer first. And, of course, the government would agree with that, and we do, and it's in the Internal Revenue Manual, and we always look to the taxpayer first, and there's evidence here that we tried. We saw the company was completely insolvent. We reached a settlement agreement with, a collection agreement with FECP, and they were to pay a certain amount, almost a million... So what's the difference between looking to the taxpayer first and undertaking all reasonable collection efforts? Well, now you get into a... I'm confused by your argument still. I greatly apologize. I think that what the tax court would have to do is exercise its discretion to determine whether the government's collection actions had been reasonable, because that's the way the tax court cases, where this law evolved. That's what the tax court says the test is, not whether the government made collection efforts against the debtor or the taxpayer, but whether they were reasonable. Now... In this text, this tax court did not do that in this case. That's correct. This court... There's no need to look at it. This court said that law doesn't apply since Stern. This is where I was pressing you on the hypothetical. I'm not sure I got an answer, which was, let's assume hypothetically, we say they're right. You need to make all reasonable collection efforts. We send it back. You go into the tax court and say, okay, we're going to make reasonable collection efforts. We're going to seize everything. Is there any procedural reason, if all that happened, that then you couldn't come right back after Mr. Kardash and do the same thing, because even unreasonable collection efforts are not going to exhaust the liability? That's my question. Any procedural barriers, statute of limitations, latches, equity, whatever? I don't believe so, because Mr. Kardash filed a tax court petition that would have suspended the statute of limitations with regard to collection against him. Therefore, if this proceeding continued, then... I think it would still be open in that regard. Now, where it could change is if you change the dividends to compensation, we'd be out of luck, because that statute of limitations has run. I'd also like to emphasize that allowing the analysis of whether the commissioner has done reasonable collection actions against the taxpayer allows the whole proceeding to be sidetracked. And also, it's not within the tax court's authority under 6901 to judge whether these collection actions, any collection action the commissioner took against the taxpayer, were reasonable. I think you can see in this case how that kind of authority would allow the tax court to oversee those collection actions, and if the tax court needs to do that... In other cases that have said you have to make such efforts, haven't they... I would like to stress that no courts of appeals have done so, and courts of appeals have followed Stern in stating the test under 6901. We cited two of those cases in our brief, Feldman and Salas-Munday. They have stated the case under Stern, and they have not included this part of the test. I believe two other, the first and the fourth, I believe, have also done so. So it is not federal appellate law that includes this in the test for 6901 or for any procedure with regard to transferee liability. All right, thank you. Thank you very much, Your Honor.  Let me get to the heart of my concern about this. It's about reasonable collection efforts. Let's say there are tax court cases that go both ways about that, but here the tax court said there's no such obligation. What is there in federal law that binds us, that tells us that's an error? I don't know what there is that binds this court. I do know in the Cullifer case, which was recently before the 11th Circuit, this court recognized the general rule as it was the element from the Gumm case that was restated in Zadorkin that reasonable, non-futile collection efforts are required. And this court held that to the extent such collection efforts were required against the transferor, the commissioner had exhausted those efforts. To the extent there was such a requirement? Correct. But I did go back and read the briefs from both sides in that case, and the IRS did not argue in its brief that under Texas' version of the Uniform Fraudulent Transfer Act, this collection effort requirement was not an element. That was not argued in the brief. Counsel, the case you're just referring to, is that Cullifer? That's correct, sir. C-U-L-L-I-F-E-R. I like Culliver. Just a very quick comment about the dividends versus compensation. We don't deny that the payments were dividends. We acknowledge that in our briefs. The question is, was the tax court entitled to fine that the company received no value for them? And isn't that right? I mean, that was their finding, and we have to look at whether the record supports that finding. That's correct. We believe that there is. He cited a lot of reasons to believe your client's characterization of this as dividends in and of itself supports the determination, doesn't it? That's correct, Your Honor. But if I quote a case quotation from the tax court's opinion, it said that dividends, which are not compensation for services, cannot be exchanged or are not exchanged for reasonably equivalent value. But then goes on to hold, because they were dividends, they can't be compensated. What he says is that you didn't put forward any evidence that the dividends were compensation. Is he wrong about that? I mean, what evidence did you put into the record that the dividends were compensation? I believe the testimony of the trial was that the services that Mr. Kardash provided were no different in nature, quantity, or quality in the years in question than they were in the years where the transfers were deemed. So that's your evidence. Anything else?  I mean, are you saying there's something else you just don't remember where it was in the record? I'm just recalling the general testimony as to the nature of Kardash's service. His own testimony that this was compensation? That's correct. Or that his services weren't any different this year than in the other years? That's correct, and no conflicting testimony on that. But the problem is he also testified that they were dividends. He treated those as dividends because as an employer. That he considered them dividends. That's correct. Okay. Thank you, Mr. Brooks. We have your case under submission. We'll be in recess until tomorrow morning. Thank you.